STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
LISA E. FELDMAN (Cal. Bar No. 130019)
Assistant United States Attorney
Cyber and Intellectual Property Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0633
    Facsimile: (213) 894-0141
    E-mail:    lisa.feldman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>JOHN WINSTON BOONE,<br>    aka "John Smith,"<br>    aka "Justin Winabali,"<br>    aka "John Greene,"<br>    aka "John King,"<br>    dba "HS Consortium, Inc.,"<br>    dba "American Blog, Inc.,"<br>    dba "Great Ideas, LLC,"<br><br>                    Defendant. | No. CR 12-1014-ODW<br><br>GOVERNMENT'S SENTENCING POSITION RE: DEFENDANT JOHN WINSTON BOONE AND RESPONSE TO DEFENDANT'S SENTENCING POSITION; DECLARATION OF LISA E. FELDMAN; EXHIBITS M-T<br><br>[SUPPORTING EXHIBITS A-L CONCURRENTLY FILED UNDER SEAL]<br><br>Hearing Date: 11-10-14<br>Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the Hon. Otis D. Wright II |

        Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Lisa E. Feldman, hereby files its sentencing position regarding defendant John Winston Boone and response to defendant's sentencing position.

        This sentencing brief is based upon the attached memorandum of points and authorities, the attached Declaration of Lisa E. Feldman,

the attached exhibits (Exhibits M-T), Exhibits A-L filed under seal
concurrently herewith, the 18 Victim Impact Statements filed on
November 3, 2014, the files and records in this case, and such
further evidence and argument as the Court may permit at the
sentencing hearing in this case.[1]

Dated: November 5, 2014                    Respectfully submitted,

                                           STEPHANIE YONEKURA
                                           Acting United States Attorney

                                           ROBERT E. DUGDALE
                                           Assistant United States Attorney
                                           Chief, Criminal Division


                                                  /s/
                                           LISA E. FELDMAN
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

---

[1] The government had hoped to avoid submitting a large number of
sentencing exhibits, but believes these exhibits are necessary to
respond to the arguments made in defendant's sentencing brief and his
letter to the Court. Defense counsel has advised the government that
she has no objection to the government filing a combined sentencing
position and response to defendant's brief and a draft copy of this
brief was emailed to defense counsel last night. The government
believes that at least two of defendant's fraud scheme victims plan
to attend defendant's sentencing hearing and speak to the Court.

**TABLE OF CONTENTS**

DESCRIPTION                                                                 PAGE

TABLE OF AUTHORITIES ........................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 1

I.    INTRODUCTION ............................................. 1

II.   FACTUAL SUMMARY .......................................... 5

      A.    Defendant's Fraudulent Scheme to Sell Website Domains
            as Online Businesses ............................... 5

      B.    Victims Suffered Irreparable Financial and Emotional
            Damage ............................................. 6

      C.    Defendant's Fraud Against Victim C.C. Included
            Fraudulently Persuading the Victim's Title Company to
            Release the Victim's Escrow Funds .................. 8

      D.    Although V.A. was a Victim of Defendant's Fraud
            Scheme, Defendant Filed and Won a Civil Counter-Claim
            in V.A.'s Lawsuit and Then Harassed Her for Payment of
            the Judgment ...................................... 10

      E.    Defendant Committed his Fraud Despite Knowing that
            Some of his Victims had Health and Financial Problems
            But Callously Defrauded Them Anyway ............... 12

III.  DEFENDANT'S SENTENCING ARGUMENTS SHOULD BE REJECTED ....... 14

      A.    Defendant's Claim that he Provided "Valuable Services"
            is Contrary to the Evidence and, in any Event, Does
            Not Change the +16 Loss Enhancement ............... 14

      B.    V.A. Was a Victim of Defendant's Fraud Scheme and is
            Entitled to $60,000 Restitution ................... 17

      C.    Defendant's Reliance on his "Productive Work History"
            and "Community Service" is Preposterous ........... 18

      D.    Defendant's Sentencing Letter ..................... 19

IV.   ANALYSIS OF 18 U.S.C. § 3553(A) FACTORS .................. 21

      A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE ........... 21

      B.    HISTORY AND CHARACTERISTICS OF DEFENDANT .......... 21

      C.    NEED FOR JUST PUNISHMENT AND ADEQUATE DETERRENCE .. 23

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                      PAGE

    D.   THE KINDS OF SENTENCES AND THE SENTENCING GUIDELINES .... 24

    E.   NEED TO AVOID UNWARRANTED SENTENCING DISPARITY ......... 24

    F.   RESTITUTION ......................................... 25

V.   CONCLUSION ................................................ 25

# TABLE OF AUTHORITIES

DESCRIPTION                                                                 PAGE

**FEDERAL CASES**

United States v. Blitz,
      151 F.3d 1002 (9th Cir. 1998) ............................... 15

United States v. Sayakhom,
      186 F.3d 928 (9th Cir. 1999) ............................... 15


**FEDERAL STATUTES**

U.S.S.G.  §  2B1.1(a)(1) ........................................ 3

U.S.S.G.  §  2B1.1(b)(1)(I) ..................................... 3

U.S.S.G.  §  2B1.1(b)(2)(A) ..................................... 3

18 U.S.C.  §  3553(a) .......................................... 21

18 U.S.C.  §  3553(a)(2) ....................................... 23

USSG 2B1.1, App. Note 3(a) ..................................... 14

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

The facts of this case show that defendant John Winston Boone ("defendant") is a financial predator, a master manipulator and a pathological liar who will do or say anything to steal money from his victims.

On November 8, 2013, defendant pleaded guilty to two counts of wire fraud, in violation of 18 U.S.C. § 1343.  For five years, defendant callously preyed on unsuspecting victims, most of whom had a dream of buying an online business so they could work from home. Using multiple aliases, defendant posted advertisements on popular business websites, offering website domains for sale.  When prospective buyers responded to his ads, defendant sent them fraudulent financial records purportedly reflecting past advertising revenue generated by the websites.  He lied about his employment history to appear more credible and made numerous false promises to provide training and assistance in setting up the websites.  Because defendant was so convincing, his victims signed purchase agreements for the websites and paid him via wire transfer or cashier's check. As soon as he got the money, he ceased all contact with the victims. Defendant ultimately scammed 18 victims out of a total of over $1.2 million, leaving them devastated both financially and emotionally.

The investigation made clear that defendant is extraordinarily charismatic and manipulative, while lacking any conscience.  These traits explain how defendant convinced a reputable title company to release a victim's escrow funds by falsely claiming that the deal had been consummated.  Defendant defrauded another victim, even after learning he was seeking to work from home because he was disabled.

He stopped communicating with victims despite their desperate emails requesting return of their money, some to pay medical bills.

Moreover, like several other victims of this fraud scheme, V.A. sued defendant in state court for return of her $60,000 down payment. However, defendant *had the audacity to file a counter-claim seeking the remaining $40,000 contract amount.* On July 17, 2009, after both parties testified and presented evidence in a bench trial, the state court judge issued a written decision awarding judgment *to defendant* -- who has a 1989 perjury conviction for falsely testifying at a trial (Ex. M) -- *and against V.A, defendant's fraud victim.* Worse, three days later, defendant gave V.A. "three options" that if she did not pay the judgment as soon as possible, he would immediately seek to seize her assets and, in effect, ruin her life. That civil judgment remains a huge emotional burden on V.A. and her family.

Defendant has been honing and perfecting his fraud skills for over 30 years, during which he has sustained convictions for fraud, theft, forgery and perjury, and has been repeatedly sued. He is so arrogant and narcissistic that even *after* the FBI executed a federal search warrant at his residence and advised him of its fraud investigation, the evidence shows that defendant went on to embezzle from *two* different employers (Ricoh and Casto Travel), for which he is now facing state felony charges. There is also evidence that he fabricated an email for a district attorney investigator in connection with the criminal investigation of the Ricoh embezzlement in an effort to falsely show that the payments he stole were authorized by his boss.

//

//

The Presentence Report ("PSR") calculates a total offense level of 22, based upon a base offense level of 7 (U.S.S.G. § 2B1.1(a)(1)), an increase of +16 for loss between $1,000,000 and $2,500,000 (U.S.S.G. § 2B1.1(b)(1)(I)), an increase of +2 for 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)) and -3 for acceptance of responsibility (U.S.S.G. § 3E1.1), with criminal history category III, resulting in an advisory Guideline range of 51-63 months imprisonment.   Based upon the factors set forth in 18 U.S.C. § 3553(a), the Probation Office recommends a sentence at the mid-point of the range, 57 months imprisonment.   The Probation Office further recommends restitution of $1,214,138.00.   The government respectfully requests that the Court adopt the factual findings, loss and victim enhancements, and restitution amounts set forth in the PSR, with the exception that V.A. should receive restitution of $60,000, rather than $55,000 resulting in a total restitution amount of $1,219,138.00.

On October 31, 2014, defendant filed a sentencing position requesting a downward variance to level 13 and arguing for a sentence of 18 months for the following reasons:   (1) he is less culpable than other defendants because he provided some of the victims with something of value, namely, the domains and/or training; (2) his family history and declining health explains his "lapse in judgment," (3) his criminal history is relatively minor compared to his "rich work history" and "history of community service" and (4) V.A. is not entitled to restitution because of the civil judgment he obtained in her lawsuit.[1]   (Def. Brief, pp. 4-5).

---

[1] Defendant made an additional argument which the government will address in a Supplemental Declaration to be filed under seal.

1      Defendant's arguments and letter to the Court are disingenuous
2  and unsupported by any evidence.  Defendant gave the victims
3  absolutely nothing of value.  As the attached exhibits and Victim
4  Impact Statements compellingly show, while defendant gave a few
5  victims the domains and "training" at some point, he only did so as
6  bait to lure them in to steal their money; once he received payment,
7  he ceased all communication and they ended up only with financial and
8  emotional turmoil.  Rather, it appears that defendant is trying to
9  re-victimize V.A. and his other victims, and is seeking to use this
10 Court to give him sentencing credit for what is likely an unjust
11 result in the civil proceeding involving V.A.

12     Defendant's other claims are equally misleading.  No matter what
13 defendant says, there is always a deep, dark truth behind the
14 statement.  For example, defendant neglects to mention that his "rich
15 work history" at Ricoh and Casto Travel includes his embezzlement
16 from both companies for which he is currently facing felony charges.
17 (PSR ¶73; Ex. N, O, P.)  American Blog is the company he created and
18 used for his fraud scheme in this case. (PSR ¶12.)  Defendant's
19 "history of community service" includes evidence he stole money from
20 families of underprivileged children through his organization. (Ex.
21 R.)

22     Based upon all the aggravating facts set forth above and below,
23 defendant remains a serious danger to the community with an almost
24 certain likelihood of recidivism.  For 30 years, nothing has deterred
25 him - not criminal investigation or prosecution, not civil judgments,
26 and not distraught victims.  Thus, the government urges the Court to
27 impose a sentence of 75 months imprisonment in this case.

28

## II.   FACTUAL SUMMARY

###   A.   Defendant's Fraudulent Scheme to Sell Website Domains as Online Businesses

A brief summary of the facts is set forth in the PSR ¶¶ 9-15. From at least 2005 and continuing until July 2010, defendant engaged in a scheme to defraud in which he sold website domain names as online businesses to numerous victim buyers throughout the United States and Canada by falsely claiming that the websites had previously generated certain advertising revenue.  To avoid detection, defendant used multiple aliases, including "John Smith," "Justin Winabali," "John Greene," and "John King" when dealing with the victim-purchasers.  (PSR ¶ 10.)

To give his ads legitimacy, defendant advertised the sale of website domains on popular business Internet websites, including Bizquest.com and Bizben.com.  When the victims responded to these posts, defendant falsely told them that the websites had previously generated certain revenue. (PSR ¶ 11.)  Defendant also told the victims that he would provide them with certain services in order to operate the websites, such as training.  When the victims asked for records to support defendant's claims of prior revenue, he provided them with falsified financial records, and in some instances, fabricated Pay Pal records, purportedly documenting the advertising revenue that the websites had already generated. (Id.)  He also provided a sham reference, "Dr. Shephard," whose phone number was linked to defendant. (Ex. F, BS 280).

Once the victims agreed to purchase the websites by signing an agreement, defendant falsely induced them to make payment, either in full or in part, with the remainder to be paid as a loan with

1  intermittent payments. (PSR ¶ 12.)  In most instances, defendant
2  instructed the victims to either wire transfer funds to bank accounts
3  in the name of defendant's businesses, "American Blog, Inc." or "H.S.
4  Consortium, Inc.," deposit a check into one of those accounts, or pay
5  his companies via cashier's check.  (Id.)

6      Once defendant received the agreed-upon full or down payment
7  from the victims, the victims never received any revenue from the
8  websites they purchased (and in some cases, never received any
9  services or access to the websites).  (PSR ¶ 13.)  When the victims
10 discovered they had been duped and contacted defendant for a return
11 of their money, defendant ceased all communications with them and
12 never returned any of their money.  (Id.)  Several victims hired
13 lawyers to send demand letters to defendant and at least two obtained
14 default judgments against him. (PSR ¶ 41.)  Many also reported him to
15 law enforcement, which is how this FBI investigation was initiated.

16     Victims M.R. and D.N. live in the Central District of
17 California; the remaining victims live in other districts throughout
18 the United States (including Northern California, Nevada, Illinois,
19 Virginia, Indiana, New Jersey, North Carolina and Texas) and Canada.
20 During the five-year scheme, defendant defrauded 18 victims out of a
21 total of $1,214,138.00. (PSR ¶¶ 36, 38).

22     **B.    Victims Suffered Irreparable Financial and Emotional Damage**
23     As described in the heart-wrenching Victim Impact Statements
24 submitted by 18 of the victims, defendant caused irreparable
25 financial hardship, physical suffering, and psychological distress to
26 his victims, including loss of retirement and college funds, loss of
27 homes due to inability to make mortgage payments, ruined credit, and

28

bankruptcy. (See also PSR ¶¶ 38-41).  Many victims experienced anger

and depression while citing that defendant ruined their lives. (Id.)

For victim V.A., not only did she lose her original investment of

$60,000, but because of defendant's counter-claim in the civil suit,

she was ordered to pay $40,000 to the defendant, and defendant then

bullied her by demanding immediate payment.  As a result of that

trauma, V.A. had to take time off from work and she was hospitalized

for several days.  She continues to have PTSD and takes medication

currently as a result of this crime. (See Victim Impact Statements,

Ex. 5, pp. 18-23.)  The victim statements are compelling:

- Victim C.C. accurately portrayed defendant as having **"no sense
  of humanity; he will say or do anything to anyone to steal their
  money.  He is a cold and calculating man. He manipulates and has
  the ability to tell lies on the fly. He can't be trusted ever by
  anyone."**  (See Victim Impact Statements, Ex. 8, p. 35; emphasis
  added.)

- In a heartbreaking long letter, Victim L.B., **a single mother,
  described her "nightmare" of her "downward spiral" into
  bankruptcy while her father was suffering from cancer,** and how
  life with her children will never be the same. (See Victim
  Impact Statements, Ex. 12, p. 50-54; emphasis added.)

- Victim M.R. referred to defendant as **a "master of deception and
  fraud" who "destroyed my life"** and caused M.R. to lose his home
  **and file for bankruptcy.**  He also explained that, "The
  psychological toll of developing a relationship with [defendant]
  over a several month period, only to have him steal from me,
  still haunts me.  **He is the most insidious type of "white
  collar" criminal – a true sociopath, who patiently and
  methodically plays his victims through false trust, carefully
  forged documents and accounts, and shill references.  On the day
  of my meeting with him to turn over the funds and take
  possession of his website, he methodically played me, pretending
  to transfer accounts and consult me on building the business for
  two full days, knowing it would take that much time for my check
  to clear."**  (See PSR 39; Victim Impact Statements, Ex. 15, p.
  65; emphasis added.)

7

- Victim K.L. stated that he "spoke with Mr. Boone many times and provided him the opportunity to repay us. **It amazed me at his brazen attitude and lack of concern. He seemed to be surprised that I was resourceful enough to have tracked him down to discover his real name, home address and contact phone number.** Contacting him at his home residence as the highlight for our company. It was amazing to hear the fright and or surprise in his voice at having us penetrate his personal scheme to uncover who he really was." (See Victim Impact Statements, Ex. 17, p. 72; emphasis added.)

Victim K.L.'s observation is important.  Defendant's schemes continued for years because he relied on the fact that no one would ever "connect the dots."  Taken in isolation, his lies sounded so credible because defendant is the classic dangerous "confidence man" who is incredibly charismatic.  Indeed, as detailed below, defendant was so convincing that he duped even savvy people and organizations, including a reputable title company whose sole purpose was to protect the victim's escrow money against fraud.

C.    **Defendant's Fraud Against Victim C.C. Included Fraudulently Persuading the Victim's Title Company to Release the Victim's Escrow Funds**

As part of his scheme, defendant would often arrange for victims to make a down payment, which he falsely claimed was refundable.  In some cases, in order to fraudulently induce payment, where victims wanted to first perform due diligence, defendant would recommend putting the money into an escrow account.  One victim, J.B., unfortunately put his money into the escrow account recommended by defendant, which, of course, turned out to be controlled by defendant.  (See Victim Impact Statements, Ex. 6, p. 25.)

In October 2007, victim C.C. discussed with defendant the purchase of websites for a total price of $480,000. (PSR ¶23.) Defendant tried a similar escrow scam on C.C., but wisely, C.C. insisted on placing his $29,000 escrow money in Chicago Title, a

reputable title company, while he performed due diligence.  (Ex. A,

BS 1395.)  When defendant claimed to have worked at Microsoft on the

original team that created the PowerPoint software, C.C. discovered

otherwise:

> Justin [defendant] had previously told me that he was at
> Microsoft. I asked him which division and he told me he was
> on the original PowerPoint team in the Bay Area.  I said
> really, I was at Genigraphics at the time and I was the
> lead liaison from a sales perspective between Microsoft and
> Genigraphics.  He asked me if I knew Bob Gaskins, the
> leader of the PowerPoint Team at Microsoft.  I said yes,
> but it has been at least 15 years since I had any contact
> with him.  The next day I looked up Bob Gaskins and sent
> him an email. He replied the next day with a list of
> everyone that ever worked on PowerPoint while he was there.
> Justin's [defendant's] name was not on the list.

(Ex. A, BS 1395, 1399.)[2]

Based on this and other red flags, victim C.C. decided not to go

through with the website purchase and contacted Chicago Title to

return his money.  He was shocked to learn that the title company had

already released the money to defendant after defendant's false

representation that the purchase had already gone through.  (Ex. A,

BS 1395-96; 1399-1400.)  Since defendant would not return the money,

C.C. had to seek reimbursement from Chicago Title and ultimately had

to file a civil suit against Chicago Title.  As one can imagine, C.C.

suffered extreme stress because of this situation.

//

//

//

//

---

• [2] Defendant likewise told victim D.S. that he "was the developer
of PowerPoint and that he made $1.8 mm in 2008 from 380 of his
websites."  (See Victim Impact Statements, Ex. 18, p. 76.)

  **D.** **Although V.A. was a Victim of Defendant's Fraud Scheme, Defendant Filed and Won a Civil Counter-Claim in V.A.'s Lawsuit and Then Harassed Her for Payment of the Judgment**

Defendant displayed particular predatory conduct toward victim V.A.  In July 2006, V.A. entered into a purchase agreement to buy two websites from defendant for $100,000, in which she paid him $60,000 in cash and agreed to finance the remaining $40,000.  (PSR ¶20; Ex. B, BS 1393, 1340-1344).  Ultimately, when she discovered she had been defrauded, V.A. -- like several other victims -- sued him for fraud. However, unlike with the other victims who obtained default judgments against defendant, defendant *counter-sued* (naming her husband's business).  The case proceeded to a bench trial before a state court judge, during which both V.A. and defendant testified and presented email evidence.  (Ex. B, BS 281866-71).  On July 17, 2009, the state court judge issued a Statement of Decision in favor of defendant, and awarded defendant judgment of $40,000 plus interest.  (Id.)  While the government has not seen a transcript or the exhibits from the trial, given defendant's history of perjury at trial and fabrication of email evidence in connection with a criminal investigation (Exs. N, O.) the government is concerned that this civil judgment is a miscarriage of justice.

Defendant then proceeded to harass V.A. for payment of the judgment.  Within three days later, defendant contacted her and said he needed to speak by phone.  V.A. sent a reply email noting this was her "dream business" and asking him to send her an email before calling her *because she gets panic attacks*:

//

//

//

John,

I have gone so much on this issue as I have never had such experience in the past. **Up to now, I have spend more than 100,000 on this deam [dream] business.** What do you suggest???

**Also, I would appreciate if you send me email 1st as I have a medical problem and I get panic [sic]. During the court hearing it was close that I lose my job.**

Regards,

[V.A.]

(Ex. B, BS 281875; emphasis added.)

Later that same night – now aware that V.A. suffers from panic attacks and that she almost lost her job during their civil trial – defendant sent the following intimidating email to V.A., along with a spreadsheet titled "Rental Property Analysis", now claiming the total judgment she owed him was "$112,000":

[V.A.],

As you already know, the Judge awarded the case in my favor which means I'm entitled to **$40,000**, plus interest of 6% dating back to 2006 until the judgment is satisfied. The Judgment also entitles [sic] to attorneys fees which are around the same cost you incurred. The total judgment is in excess of $100,000 owed to me.

We can handle it one of three ways but we need to handle it ASAP.

**The first option,** I can attach your wages [business name redacted], place three (3) liens on each property [three Northern California cities redacted], including repossessing your vehicles [names redacted] and placing another lien on the driving school business until the $112,000.00 is paid in full.

**The second option,** you can pay me the total amount of the Judgment (**$112,000**).

The final option, agree to transfer over real estate property [three cities redacted], that is the equivalent to the amount owed (**$112,000.00**) to avoid ruining your credit and causing embarrassment at your place of employment [business name redacted].

Please send over your thoughts before Noon tomorrow **(Tuesday, the 21st of July)** as I plan to proceed with enforcing the court judgment IMMEDIATELY.

*(NOTE: if you proceed with Option #3, then complete the attached spreadsheet.)*

Thoughts?

(Ex. B, BS 281874-281875, bold, italics and underline <u>in original</u>.)  In other words, defendant was not simply satisfied with fraudulently obtaining her $60,000 down payment, but he aggressively sought an additional $40,000 from V.A. and then when he obtained a judgment, he demanded immediate payment, knowing it would take a huge emotional toll on V.A.  It is the government's hope that this sentencing proceeding and relevant pleadings will assist V.A. in going back to state court and addressing that civil judgment.

**E.   Defendant Committed his Fraud Despite Knowing that Some of his Victims had Health and Financial Problems But Callously Defrauded Them Anyway**

Defendant also knew that some victims had health or financial problems, but callously defrauded them anyway.  For example, on April 21, 2009, victim S.D. sent the following email to defendant responding to his advertisement:

**I have recently become disabled and I am too proud to apply for Social Security...need to find a business that will allow me to work without driving anywhere.  I have a STRONG Sles [sic] and Marketing background, and this business looks very attractive to me.  Please contact me asap, let's get started! Thank you!**

(Ex. C, BS 1421-22; emphasis added.)

Defendant responded that "the site is completely turn-key," had "three revenue streams" and was "cash flow positive."  (Ex. C, BS 1421.)  Defendant later sent S.A. various financial reports, a detailed Profit and Loss statement, and emphasized that "the new owner will acquire a stable business with "no debt" so he can focus

1    on increasing revenue, or maintaining the existing revenue stream."

2    (Ex. C, BS 1423.)

3         In another example, victim R.D. purchased a website from

4    defendant and paid a $55,000 down payment. (Ex. D.)   After that,

5    defendant never fulfilled any of his promises, and R.D. became

6    increasingly anxious; one of his many emails details his anxiety

7    about the situation. (Ex. D, BS 1594.)   When the site did not work

8    properly and after repeated attempts by R.D. to have defendant fix

9    the site, defendant took it back.   Defendant never returned R.D.'s

10   $55,000 despite repeated pleas and knowing that R.D. needed money to

11   pay medical bills.   On February 11, 2008, R.D. wrote to defendant:

12        Hi Justin [Winabali, one of defendant's aliases], I just
         checked my bank account and didn't see any incoming funds
13       wired to it.  Were you able to send it on Friday?  **I was
         relying on it being available today, as I am sending out**
14       **checks to make large medical bill payments today.**  Please
         advise at your earliest convenience.
15
     (Ex. D, BS 1606.)   Defendant ignored his repeated, desperate
16
     requests.   On February 27, 2008, R.D. wrote to defendant:
17
         Justin,
18
         Is there something I did that might have caused you to
19       avoid me?  **I hope that I haven't been disrespectful in any**
         **way and that I've been courteous in my desperate pleas for**
20       **help and consideration.**  If not, then I apologize.  I only
         want this to come to a mutual conclusion for us both. I
21       haven't heard from you in over 4 weeks and I feel like I'm
         being ignored for some unexplained reason. ... Please let
22       me know ASAP what I need to do to facilitate the return of
         the $55K down payment that I am asking to be returned.  **My**
23       **financial situation is deteriorating significantly every**
         **day and I need the money.**  I hope you understand that I
24       would not be this persistent otherwise.  Thank you very
         much!
25
     (Ex. D, BS 1608.)
26

27

28

                                    13

Seven months later, R.D. was still trying to get back his $55,000 down payment after defendant continued to ignore his repeated requests.  R.D.'s emails are painful to read. (Ex. D, BS 1619-1636).

## III. DEFENDANT'S SENTENCING ARGUMENTS SHOULD BE REJECTED

Defendant's sentencing arguments should be rejected and show that he remains a danger to the public.

### A.  Defendant's Claim that he Provided "Valuable Services" is Contrary to the Evidence and, in any Event, Does Not Change the +16 Loss Enhancement

The government agrees with the Probation Office's determination that the actual loss in this case is over $1.2 million and the intended loss is approximately $1.7 million, based upon executed agreements signed by defendant and various victims, and thus, defendant should receive a 16-level enhancement for loss between $1 million and $2.5 million. (PSR 36, 49-51.)  With the exception of $60,000 for V.A., defendant apparently does not dispute the actual loss amount.  His claim that the probation office concluded that the court should consider actual loss rather than intended loss is directly contrary to the PSR 49-50 and to USSG 2B1.1, App. Note 3(a).

In any event, defendant admits he defrauded the victims, but inconceivably claims that he provided "some" of them with valuable services, namely, the websites themselves and "training."   (Def. Brief, pp. 6-9.)  Defendant argue that under USSG 2B1.1, N. 3(E)(i) and United States v. Austin, he should receive "credit" to his loss amount.  (Id. at 7.)

Defendant's argument is appalling and shows he is still trying to steal money from his victims, and with this Court's assistance. The guidelines and Austin involve a case where the defendant pays back his victim to reduce their monetary loss.  That is the opposite

of what defendant did -- although he may have provided a few victims with minimal "training" and/or the domains at one time, it was only as an <u>inducement</u> to get the victims to pay him <u>as part of his fraud</u>. Under these circumstances, no credit should be given.  <u>See</u> <u>United States v. Sayakhom</u>, 186 F.3d 928, 947-948 (9th Cir. 1999) ("In calculating loss, the district court should give credit for any legitimate services rendered to the victims.  However, if the "value" to the victim is merely a part of the fraudulent scheme, the defendant is not entitled to a credit") and <u>United States v. Blitz</u>, 151 F.3d 1002, 1012 (9th Cir. 1998) (holding defendants not entitled to credit for recoveries that "enabled [defendants] to continue their scheme for a longer period by staving off detection.")[3]

The same applies to the domains.  Once he got a victim's money, defendant ceased all communications with that victim and they were left having no idea how to operate the website, assuming it was ever transferred to them.  Most were not technologically savvy and thus were relying on defendant's expertise to help them set up the website as he had promised.  As the exhibits show, for some, the website never worked and/or defendant never even gave them login information

---

[3] Defendant claims he gave "some level of training" to four victims: G.W., L.B., M.R. and D.N. but again, wholly mischaracterizes the facts.  D.N. received training but once she paid him "he all of a sudden disappeared and I was unable to get a hold of him." (D.N. Victim Statement, Ex. 13).  Same thing happened with G.W.  Similarly, M.R. stated that defendant "methodically played me, pretending to transfer accounts and consult me on building the business for two full days, knowing it would take that much time for my check to clear."  (M.R. Victim Statement, Ex. 15.)  Defendant cannot possibly argue that L.B. received any value from him after reading her heartbreaking victim impact statement (Victim Statement, Ex. 12.)

to access the website.[4]   Defendant often transferred the name back to himself or tried to resell the same domain to another prospective buyer.[5]   The websites were only valuable assuming they worked and generated revenue.  With the exception of D.D. who received $5,000 in revenue, none of the websites ever generated revenue and thus, were useless to the victims.  Most importantly, none of the victims would have bought the websites if they knew they did not generate revenue.

In any event, whatever minimal value can be assessed a domain or "training" (which defendant noticeably fails to provide), such value cannot possibly be high enough to lower defendant's loss from $1.7 to less than $1 million.  Indeed, a cursory review of Godaddy.com shows that in general, prices for websites are minimal, i.e. less than $50.00, etc. (See Ex. T, GoDaddy printouts showing current inexpensive purchase prices for websites.)[6]

---

[4]   For example, in a lengthy email, victim R.D. complained to defendant that he had not received training, the site was not functioning properly, and that based on the Profit and Loss Statement he had been provided, the website should have been generating income, but it wasn't.  (Ex. D., BS 1594.)  Although defendant provided victim D.N. with minimal training, he did so to induce her continue paying him and he never gave her login or password information for the website and never transferred the domain name registration into D.N.'s name, both of which had been promised.  (See Ex. E, BS 352-354.)

[5]   Within a week after getting M.R.'s $55,000 cashier's check, defendant changed the domain registration name back to defendant's alias name. (Ex. F, BS 280, 345).

[6]   The government does not understand defendant's argument regarding the PayPal records and how they relate to loss.  Defendant gave some victims fabricated PayPal records and he gave others "Profit and Loss Statements" for the websites.  As defendant admitted in his plea agreement, all of the financial records he gave victims were "purportedly documenting the advertising revenue that the websites had already generated." (Plea Agreement, ¶ 11.)

### B.   V.A. Was a Victim of Defendant's Fraud Scheme and is Entitled to $60,000 Restitution

While accepting responsibility for his fraud scheme, defendant argues that V.A. is not entitled to restitution because "there is an outstanding and valid civil judgment which found that she owed Mr. Boone the value of the contract." (Def. Brief, p. 9.)  However, the FBI investigation shows, and the Probation Officer concluded, that V.A. is one of the many victims of defendant's fraud scheme.  The purchase agreement defendant gave her that she signed matches the format of the purchase agreements signed by other victims in this case.  See Ex. D (victim R.D.), Ex. E (victim D.N.), and Ex. I (victim K.D.).  Likewise, the format of the Profit and Loss Statements defendant gave to V.A. and all of the victims are the same.  There is no question that V.A. should be awarded restitution for the $60,000 she paid to defendant in the scheme.

Defendant's reliance on the civil judgment is suspect.  In his Statement of Decision, the state judge explained that V.A. testified and introduced emails to the effect that defendant had not transferred assets, training and support services as agreed, including server codes and passwords.  "On the other hand, John Boone testified and introduced e-mails to the effect that Great Ideas fully performed all of its obligations under the Asset Purchase Agreement in a timely manner, and provided all of the necessary server source codes, passwords, training, even additional training, and support services to plaintiff." (Ex. B, BS 281866-71).  While the government does not have a transcript of the trial, given the overwhelming evidence of fraud in this FBI investigation, defendant's history of perjury at trial, and evidence that he altered an email for a D.A.

1    investigator in a criminal investigation, the government is concerned

2    that the state court civil judgment is a miscarriage of justice.

3    (See Exs. N, O, P, and R.)

      **C.   Defendant's Reliance on his "Productive Work History" and
4           "Community Service" is Preposterous**

5          Defendant further argues that he should receive a downward

6    variance because of his "productive work history" and he lists

7    various companies at which he was employed, including Ricoh Company,

8    where he was an IT Manager, and Casto Travel International, where he

9    was IT Vice President. (Def. Brief, pp. 10, 13). Defendant fails to

10   explain that he was fired from both Ricoh and Casto and is currently

11   facing felony charges for embezzling from both of those companies, as

12   well as a civil lawsuit that was filed by Casto Travel. (PSR 73;

13   Exs. O, P, Q). Equally disturbing, he also lists American Blog,

14   which is defendant's company that he used for his fraud scheme in

15   this case. (PSR 12).

16         Likewise, he claims he deserves a variance because he

17   "consistently gave back to the community," citing Christine Boone's

18   letter describing his creation of an AAU team called "NorCal Supreme"

19   to help disadvantaged kids. (Def. Brief, p. 14). However, there is

20   evidence that in 2011, defendant stole money from the parents of

21   those children. According to a "RipOff Report" post, in May 2011,

22   defendant met with parents of NorCal Supreme and promised to pay for

23   training/practice and tournament expenses including all travel,

24   lodging, transportation and meals, for the student players and

25   promised up to six tournaments that the players would attend.

26   It further alleges that:

27

28

                                        18

> At this meeting, [defendant] also required that parents give or send him a check for $150 as a security deposit for the uniforms. [Defendant] promised not to cash these checks and to destroy them once the uniforms were returned. Contrary to his promise, [defendant] fairly promptly cashed all the checks.... Both teams subsequently organized themselves, and played in the tournaments with all costs covered by parents, including tournament fees, transportation and other travel expenses. [Defendant] has been informed that the uniforms are now available [to be returned], but he refuses to retrieve them and has not returned any of the cash from the cashed checks as of Aug 30, 2011."

(Ex. R).

### D.   Defendant's Sentencing Letter

Defendant's sentencing letter to this Court is striking:

> As it relates to my crime, this is my explanation as to what happened and most importantly, why I committed the crime. Why I did it was as simple as I needed the cash flow to meet my financial obligations. Every buyer received value in the transaction but I made the mistake of misrepresenting the financial reports.

(Def. Brief, Ex. C.)  Unlike many defendants who come before this Court, defendant had the talent and education to be successful. As the Probation Officer noted, "Unfortunately, he utilized his valuable knowledge to commit fraud during the latter part of his career. He did not provide any insight as to how or why he became involved in the instant offense." (Rec. Letter, p. 6.)  Defendant's letter again fails to provide any insight because he can't, which makes him more dangerous and virtually certain to be a recidivist.

Regarding the "value" to the victims, it is hard to fathom how defendant can make this claim before this Court given the evidence in this case, as presented in the government's sentencing exhibits.

//

//

//

The only reference to any kind of regret is the following:

> I feel deeply saddened by the crime I committed and the victim's associated with my case. I intend to pay full restitution to all victims that suffered any loss.  I am sorry for letting down my family and friends.  Bad judgment has left me with plenty of personal work to do so I can avoid making bad decisions in the future.

Equally significant, defendant never apologizes to the victims. He may be "saddened by the crime," but only because he got caught. His promise to pay restitution to "all victims that suffered any loss" is insincere and meaningless because, at the same time, he is arguing that his loss should be lowered because "every buyer received value in the transaction."

## IV.   ANALYSIS OF 18 U.S.C. § 3553(A) FACTORS

As the facts of this case make clear, there are absolutely no mitigating factors in this case.  To the contrary, in light of the multiple serious aggravating factors as detailed above, the government strongly urges this Court to impose a sentence of 75 months imprisonment.  The government believes that all of the Section 3553(a) factors militate in favor of a sentence of 75 months imprisonment, and that such a sentence is a sentence sufficient but not greater than necessary to meet the sentencing goals of 18 U.S.C. § 3553(a).

### A.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

Analyzing Section 3553(a)(1), defendant's crimes warrant significant punishment.  As described above in detail, the numerous aggravating factors in this case include (1) the five-year length of the scheme, (2) the large number of victims, which is twice the number required to trigger the 2-level enhancement, (3) defendant's extraordinarily manipulative actions, including fraudulently

convincing Chicago Title to release a victim's escrow funds, (4) defendant's callous conduct toward the desperation he was causing his victims; and (5) defendant's conduct in counter-suing victim V.A. -- knowing that in reality, he had defrauded her – and then using intimidation to try and collect the judgment after she told him she suffers from panic attacks.  In the government's opinion, such predatory and cruel conduct goes far beyond the typical fraudster.

**B.   HISTORY AND CHARACTERISTICS OF DEFENDANT**

With respect to the history and characteristics of defendant pursuant to Section 3553(a)(1), this factor is aggravating and supports an upward variance, particularly in light of defendant's sentencing arguments and letter continuing to justify his actions and showing no remorse.  Defendant's criminal history dates back to 1981 While he argues that his criminal history is relatively minor, it is significant that his crimes have become increasingly more brazen and serious.  He has not been deterred by prosecution, jail, or civil lawsuits, and likewise was not deterred from committing crime even after the FBI search warrant at his home when he knew he was the subject of a federal criminal fraud investigation.

Indeed, before defendant was arrested and placed on federal supervision in this case, but after the FBI executed its search warrant at defendant's residence on July 20, 2010, -- and thus, while knowing he was under federal criminal investigation for wire fraud -- defendant is alleged to have embezzled over $78,000 from his then employer, Ricoh and soon thereafter, after being fired from Ricoh, he allegedly committed another fraud against a subsequent employer, Casto Travel.  (See Exs. O, P, and Q.)  Equally disturbing, the evidence shows that while knowing he was also under investigation by

21

state authorities for the Ricoh embezzlement, defendant (through his attorney) provided a district attorney's office investigator with a fabricated email purportedly from his then Ricoh supervisor approving the payments he allegedly embezzled.  The Santa Clara D.A.'s Office has charged defendant in a felony complaint with grand theft, forgery, embezzlement, and using personal identification information without authorization arising from both of these embezzlement schemes. (PSR § 73).[7]

Defendant also later violated the terms of his federal pretrial supervision, leading to his bond being revoked.  This criminal history demonstrates defendant's arrogance and a shocking disregard for the law and the criminal justice system.

### C.   NEED FOR JUST PUNISHMENT AND ADEQUATE DETERRENCE

Section 3553(a)(2) requires the Court to consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

This factor also supports a sentence of 75 months imprisonment. As made clear by their victim impact statements, the victims were devastated both financially and emotionally, and a significant

---

[7] The Deputy D.A. has advised government counsel that a charge for the fabricated email to the D.A. investigator was included in the original felony complaint but inadvertently omitted from the most recently filed complaint. She further advised that a new complaint will be filed shortly adding that charge.

punishment is appropriate to reflect the irreparable harm to the victims.

Defendant's lengthy criminal history, the fact that his crimes have become more brazen, his manipulative and callous conduct toward his victims, his abuse of the court system, and the fact that he committed two more fraud schemes against two different employers even after the FBI executed a search warrant at his home demonstrate defendant's utter disregard for the law and his victims, and thus militates in favor of a greater sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."  Based on this history, clearly, prison is not a deterrent for defendant, which makes him a real danger to the community with an extreme risk of recidivism, particularly in light of his sentencing arguments.

D.    THE KINDS OF SENTENCES AND THE SENTENCING GUIDELINES

Section 3553(a)(3), (4) and (5) require the Court to consider the kinds of sentences available, the Sentencing Guidelines, and the policy statements issued with the Sentencing Guidelines.  Given all of the other Section 3553(a) factors and as the advisory Guidelines range "advises," imprisonment is the only appropriate "kind" of sentence in this case.

E.    NEED TO AVOID UNWARRANTED SENTENCING DISPARITY

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Given the many aggravating factors in this case, a two-level upward variance is reasonable and appropriate and will not

create an unwarranted disparity in sentencing among defendants who are convicted of engaging in similar fraud schemes.

### F.   RESTITUTION

Finally, Section 3553(a)(7) requires the Court to consider restitution at sentencing.  In the plea agreement, defendant agreed to pay restitution to all victims of relevant conduct.  The government agrees with, and the evidence supports, the recommendation of the Probation Office to impose restitution of $1,214,138.00 to the 18 victims of defendant's fraud scheme.  For the reasons set forth above, the government respectfully requests that additional restitution of $45,000 be awarded to V.A. and thus, the total amount of restitution would be $1,259,138.00.

## V.   CONCLUSION

For all of the foregoing reasons, the government strongly urges the Court to impose a sentence of 75 months imprisonment, a restitution amount of $1,219,138.00, three years supervised release, and all of the conditions of supervised release recommended by the Probation Office, including the computer condition.

Dated: November 5, 2014          Respectfully submitted,

                                 STEPHANIE YONEKURA
                                 Acting United States Attorney

                                 ROBERT E. DUGDALE
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 _____/s/_____
                                 LISA E. FELDMAN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

24

DECLARATION OF LISA E. FELDMAN

I, LISA E. FELDMAN, declare as follows:

1.    I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California.  I represent the government in the prosecution of <u>United States v. John Winston Boone</u>, CR 12-1014-ODW.  I submit this declaration in support of the government's position regarding sentencing and in response to defendant's position re: sentencing.  I have been assigned to this case from the inception of the investigation and throughout the prosecution.

2.    **Exhibits A through L** are being filed separately (and concurrently) under seal because they consist of investigative reports and other documents regarding the victims and contain the victims' full names and email addresses.

3.    Attached collectively as **Exhibit M** are true and correct copies of pleadings reflecting defendant's 1989 perjury conviction in San Mateo Municipal Court.  (<u>See</u> PSR ¶ 66.)  The four-count felony complaint, filed on June 5, 1989, charged defendant with perjury in connection with testifying falsely at a jury trial (Counts 1 and 2), preparing false evidence (Count 3) and offering false evidence at the trial "knowing the same to have been forged or fraudulently altered or antedated" (Count 4).  (BS 2112-2113.)  Although the PSR states that a description of the offense was not received,[1] the Complaint alleges that defendant **falsely testified under oath during a jury trial before a state court judge** and that **he submitted a forged or fraudulently altered towing receipt from Jack's Automotive as a**

---

[1] Given the large volume of evidence in this case, the USPO may have overlooked this document.

1  **defense exhibit at that trial.**  On July 7, 1989, defendant pled "nolo
2  contendere" to Count 1 (perjury) and was sentenced to six months in
3  jail.  (BS 2114-2122.)   These documents were obtained by a private
4  investigator for victim Michael Weimar and provided to the FBI with
5  other documents relating to defendant's fraud scheme against Weimar.

6      4.   Attached as **Exhibit N** is a true and correct copy of the
7  Government's Position Supporting Revocation of Bond with exhibits,
8  filed on July 2, 2013, Docket No. 23. (Although this document was
9  publically filed, the government is including it here with exhibits
10 so that these documents are readily available to the Court with the
11 other sentencing exhibits.  The multiple exhibits include felony
12 criminal complaints filed against defendant on April 25, 2012 and
13 March 20, 2013 alleging embezzlement he committed while employed as
14 IT Manager at Ricoh.  As the documents reflect, defendant is also
15 alleged to have intentionally presented an altered email to a
16 District Attorney investigator during the criminal investigation in a
17 fraudulent attempt to demonstrate that he had not committed
18 embezzlement.

19     5.   Attached collectively as **Exhibit O** are true and correct
20 copies of the Petition filed by the U.S. Pretrial Services Agency,
21 the Minute Order of the July 8, 2013 hearing revoking defendant's
22 bond, and the Order of Detention filed by the Honorable Audrey B.
23 Collins on July 10, 2013.  In her detention order, Judge Collins
24 concluded that defendant was a "danger" based upon:

25       The defendant's repeated attempts to defraud. Even if these
         predated his initial detention hearing, they were unknown
26       to the Magistrate Court [in the Northern District of
         California] at the time of his hearing.  In addition, risk
27       of flight is increased because of a new criminal filing
         versus the defendant **and** a new civil filing against him.
28       The defendant's repeated violations of the terms of his

pretrial release, specifically, his repeated use of the internet and his failure to inform Pretrial Services that his employment had been terminated, also justify his detention.[2]  His alleged falsification of an email in connection with a related case adds an additional ground.

(Emphasis in original.)

6.   Attached as **Exhibit P** is a true and correct copy of the updated felony criminal complaint filed against defendant on March 11, 2014 in the Superior Court in Santa Clara County, California relating to defendant's embezzlement and fraud crimes against his then-employers, Ricoh and Casto Travel, which includes an enhancement for "aggravated white collar crime" due to "a pattern of related felony conduct."  Santa Clara Deputy District Attorney Jennifer Deng has advised me that due to an administrative error, the original felony complaint was dismissed and the attached complaint was refiled on March 11, 2014.  DDA Deng also advised me that due to the confusion with refiling, the charge regarding the altered email which was included with the original complaint was inadvertently not included in the new one, and that an amended complaint will be filed this week to add that charge.  The government will file the new felony complaint as an additional exhibit as soon as received.

7.   Attached as **Exhibit Q** is a true and correct copy of an FBI report of telephonic interview of J.M. conducted on April 8, 2013. During the interview, J.M. stated that he rented a portion of a home from defendant in approximately August of 2011 and that following a dispute regarding the condition of the property, J.M. sued defendant in small claims court.  J.M. stated that defendant lied during the

---

[2] If I recall correctly, it was determined at the bond revocation hearing that defendant was terminated from his employment with Samsung while on pretrial release, but failed to tell .

small claims court and claimed that the property was up to code.

J.M. stated that as a result, he lost his case in small claims court.

8.   Attached as **Exhibit R** is a true and correct copy of a printout of a post currently listed on the RipOffReport.com entitled "Complaint Review: John Boone" and posted on August 30, 2011.   The post states that defendant is the owner of non-profit "Norcal Supreme" in San Francisco, California, and goes on to allege that on May 5, 2011, defendant met with parents and promised to pay for training/practice and tournament expenses including all travel, lodging, transportation and meals, for the student players and promised up to six tournaments that the players would attend.   It further alleges that:

> At this meeting, [defendant] also required that parents give or send him a check for $150 as a security deposit for the uniforms. [Defendant] promised not to cash these checks and to destroy them once the uniforms were returned. Contrary to his promise, [defendant] fairly promptly cashed all the checks.... Both teams subsequently organized themselves, and played in the tournaments with all costs covered by parents, including tournament fees, transportation and other travel expenses.   [Defendant] has been informed that the uniforms are now available [to be returned], but he refuses to retrieve them and has not returned any of the cash from the cashed checks as of Aug 30, 2011."

While the government has not been able to verify the accuracy of the above complaint, the government has no reason to believe that it is not accurate, particularly given defendant's history of fraud and deceit.

9.   Attached as **Exhibit S** is a true and correct copy of the government's 609(b) motion filed on October 28, 2013 and attached January 2005 Palo Alto police report and criminal history printout relating to defendant's 2005 arrest for a false billing scheme in Palo Alto, California in Docket No. BB515216, for which he was later

convicted and sentenced in 2006.  (See PSR ¶ 67.)[3]  A description of
the facts of the billing fraud scheme is also contained in the
government's 609(b) brief, attached.[4]

    10.  Attached collectively as **Exhibit T** are true and correct
copies of printouts from GoDaddy.com, which I printed on November 1,
2014, reflecting purchase prices for the websites listed on the
printouts.

    I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct and that
this declaration is executed at Los Angeles, California, on November
5, 2014.

LISA E. FELDMAN

---

  [3] A copy was these documents was produced in discovery and
provided to the USPO but as noted above, given the large amount of
discovery in this case, it may have been overlooked in the
preparation of the PSR.

  [4]Paragraph 67 of the PSR states that "the police report was
requested but not received."  The police report was produced in
discovery and provided to the Probation Office, but given the volume
of discovery, it must have been inadvertently overlooked.